Bryan Wolin (BW8339)
bwolin@kilpatricktownsend.com
**KILPATRICK TOWNSEND & STOCKTON LLP**
The Grace Building
1114 Avenue of the Americas, 21st Floor
New York, NY USA 10036
Tel. (212) 775-8700
Fax (212) 775-8800

Brent W. Brougher
bbrougher@kilpatricktownsend.com
(*Pro hac vice* application forthcoming)
**KILPATRICK TOWNSEND &STOCKTON LLP**
1100 Peachtree Street, Suite 2800
Atlanta, GA  30309
Tel. (404) 815-6500
Fax (404) 815-6555

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IMG PRODUCTIONS, LLC and WME IMG, LLC<br><br>  Plaintiffs,<br><br>  v.<br><br>CERTAIN UNDERWRITERS AT LLOYD'S, Syndicate 2623/0623 subscribing to Policy No. B1262FI0760115<br><br>  Defendant. | CASE NO. _____<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

IMG Productions, LLC and WME IMG, LLC file this complaint, alleging as follows:

1. This is a complaint for breach of contract, breach of the implied covenant of good faith and fair dealing, and declaratory judgment, filed by Plaintiffs IMG Productions, LLC ("IMG Productions") and WME IMG, LLC ("WME IMG" and collectively with IMG

19320157v.9

Productions, "IMG") against their insurer, Certain Underwriters at Lloyd's, subscribing to Policy No. B1262FI0760115 ("Underwriters"). Among other things, IMG seeks damages for Underwriters' breach of the Errors & Omissions policy (discussed below) in connection with IMG's successful defense of a third-party lawsuit and arbitration, remedies for Underwriters' bad faith conduct, as well as judicial declarations regarding Underwriters' obligations.

## PARTIES

2.  Plaintiff IMG Productions is a New York limited liability company located at 11 Madison Avenue, New York, New York, and transacts business in the State of New York and elsewhere. IMG Productions is a media company that focuses on the production, development and broadcast of media to the public. IMG Productions' sole member is IMG Worldwide, LLC, a Delaware limited liability company whose sole member is IMG Worldwide Holdings, LLC, a Delaware limited liability company whose sole member is Plaintiff WME IMG.

3.  Plaintiff WME IMG is a holding company organized under the laws of Delaware with headquarters located at 304 Park Avenue South, New York, New York and 9601 Wilshire Boulevard, Beverly Hills, California. WME IMG's sole member is WME IMG Holdings, LLC, a Delaware limited liability company whose sole member is Endeavor Parent, LLC, a Delaware limited liability company whose members consist of certain Delaware limited liability companies; New IMG, Inc., a Delaware corporation; and certain individual executives, some of whom are citizens of New York.

4.  On information and belief, Defendant Underwriters are insurers organized under the laws of England and Wales, with their principal place of business in London, England, United Kingdom. Under the terms of Policy No. B1262FI0760115 to which they subscribe,

Underwriters have agreed to accept service via Mendes & Mount LLP, located at 750 Seventh Avenue, New York, NY 10019-6829.

## JURISDICTION

5. This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1332, 2201 and 2202. Complete diversity of citizenship exists between the parties, and the amount in controversy is in excess of $75,000 (Seventy-Five Thousand Dollars and no/100), exclusive of interest and costs.

## VENUE

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) and (c).

## THE INSURANCE POLICY

7. Underwriters sold a "Primary Errors & Omissions" policy of insurance to named insured WME Entertainment Parent, LLC, under Policy No. B1262FI0760115 (the "E&O Policy" or "Policy"). The E&O Policy provides up to $20 million in coverage, with various "retention" amounts depending on the Claim (defined below). The period of insurance covered by the Policy is June 30, 2015 to June 30, 2016. A copy of the E&O Policy is attached hereto as **Exhibit A**.

8. Under the E&O Policy, Plaintiffs IMG Productions and WME IMG each qualify as an "Insured."

9. The E&O Policy is a "claims made and reported" policy, meaning that it is triggered based on when the Claim is first made and reported to Underwriters. E&O Policy, Preamble, p. 11 of 62.

10. Under the E&O Policy, a "Claim" means "a written demand received by any Insured for money or services, including the service of a suit or institution of arbitration proceedings." E&O Policy, Section VI.G. Moreover,

>Multiple **Claims** arising from the same or a series of related or repeated acts, errors or omissions, or from any continuing acts, errors or omissions … shall be considered a single **Claim** for the purposes of this Policy, irrespective of the number of claimants or **Insureds** involved in the **Claim.** All such **Claims** shall be deemed to have been made at the time of the first such **Claim.**

*Id*.

    11.    The E&O Policy contains several "Insuring Agreements." Under the E&O Policy, Insuring Agreement F covers:

>**Damages** and **Claims Expenses,** in excess of the **Retention,** which the **Insured** shall become legally obligated to pay because of liability imposed by law or **Assumed Under Contract** resulting from any **Claim** first made against any **Insured** during the **Policy Period** or Optional Extension Period (if applicable) and reported to the Underwriters during the **Policy Period** or as otherwise provided in Clause IX. of this Policy, for one or more of the following acts first committed on or after the Retroactive Date and before the end of the **Policy Period** in the course of the **Insured Organization's** performance of **Professional Services, Media Activities** or **Technology Based Services:**
>
>1. defamation, libel, slander, product disparagement, trade libel, prima facie tort, infliction of emotional distress, outrage, outrageous conduct or other tort related to disparagement or harm to the reputation or character of any person or organization;
>2. invasion of or interference with the right to privacy or of publicity;
>3. misappropriation of any name or likeness for commercial advantage;
>4. false arrest, detention or imprisonment;
>5. invasion of or interference with any right to private occupancy, including trespass, wrongful entry or wrongful eviction;
>6. plagiarism, piracy or misappropriation of ideas under implied contract;
>7. infringement of copyright;
>8. infringement of trade dress, domain name, title or slogan, or the dilution or infringement of trademark or service mark;
>9. negligent regarding the content of any **Media Communication,** including harm caused through any reliance or failure to rely upon such content;
>10. misappropriation of trade secret; or
>11. unfair competition, but only if alleged in conjunction with and arising out of any of the acts listed in paragraphs 7. or 8. above.

E&O Policy, Insuring Agreement F, at pp. 14-15 of 62.

12. Under Insuring Agreement F, a special $25,000 retention applies to certain Professional Services, Media Activities and Technology Based Services by virtue of Endorsement 03 to the Policy. This Endorsement describes the $25,000 retention as follows:

> In respect of Coverage F: Multimedia and Advertising Liability USD 25,000 Each and Every Claim (including Claims Expenses) – but only in respect of the following **Professional Services**, **Media Activities** and **Technology Based Services**: *Production, broadcast, or distribution of television and radio programming for all forms of media* including web on-line, broadcasts in the following genres: … Children's & Religious, … distribution of broadcast of third party acquired content, … exploitation of own digital rights including the digital rights of others that 'you' (defined) have the contractual rights to exploit."

E&O Policy, Endorsement 03, p. 1 of 2 (italics added). Accordingly, a $25,000 retention applies to one or more of the "specified acts" listed in Insuring Agreement F, so long as such acts occurred "in respect of … production, broadcast, or distribution" of television programming.

13. Under the E&O Policy, Insuring Agreement A covers:

> **Damages** and **Claims Expenses,** in excess of the **Retention,** which the **Insured** shall become legally obligated to pay because of any **Claim** first made against any **Insured** during the **Policy Period** or Optional Extension Period (if applicable and reported in writing to the Underwriters during the **Policy Period** or as otherwise provided in Clause IX. Of this Policy, arising out of any:
>
> 1. negligent act, error, omission, misstatement, misleading statement or misrepresentation in rendering or failing to render **Professional Services** or **Technology Based Services;**
> 2. unintentional breach of a contractual obligation to perform
>
> **Professional Services** or **Technology Based Services**; that takes place on or after the Retroactive Date and before the end of the **Policy Period** by the **Insured** or by any person or entity for whose negligent act, error, omission, misstatement, misleading statement, misrepresentation or unintentional breach of contract the **Insured Organization** is legally responsible.

E&O Policy, Insuring Agreement A, at p. 11 of 62.

14. Under the E&O Policy, a $2 million retention applies to Insuring Agreement A.

E&O Policy, Declaration Page, pp. 1-2 of 62.

15. The E&O Policy imposes a duty to defend on Underwriters, as follows:

519320157V.9

> The Underwriters shall have the right and duty to defend, subject to all the provisions, terms and conditions of this Policy:
>
> 1. Any Claim against the Insured seeking Damages which are payable under the terms of this Policy, even if any of the allegations of the Claim are groundless, false or fraudulent. …
>
> Defense counsel shall be mutually agreed upon between the Named Insured and the Underwriters but, in the absence of such agreement, the Underwriters' decision shall be final.

E&O Policy, Section II.A, p. 15 of 62.

16.  "Claims Expenses" is defined by the Policy to include: "reasonable and necessary fees charged by an attorney designated pursuant to Clause II., Defense and Settlement of Claims, paragraph A" and "all other legal costs and expenses resulting from the investigation, adjustment, defense and appeal of a **Claim,** suit or proceeding arising in connection therewith, or circumstance which might lead to a **Claim,** if incurred by the Underwriters, or by the **Insured** with the prior written consent of the Underwriters … ." E&O Policy, Section VI.H.1-2, p. 24 of 62.

## THE *KATSORIS* CLAIM

17.  On or about November 24, 2015, Nick Katsoris ("Katsoris") and his foundation, The Loukoumi Make a Difference Foundation, Inc. ("Loukoumi"), served a "cease and desist" letter on IMG Productions, Nickelodeon (then operated by Viacom Inc.) and others, asserting violations of Katsoris' and Loukoumi's rights in connection with the release of a television development deal between Nickelodeon and IMG titled "I Wanna Be," to be hosted by IMG client Cam Newton. Attached hereto as **Exhibit B** is a copy of this letter.

18.  As described in further detail below, the *Katsoris* Claim developed into a wide-ranging set of allegations against IMG, both in a civil lawsuit and American Arbitration Association arbitration, that alleged violations of copyright and trademark laws, tortious conduct,

breach of contract and other violations, arising out of IMG's alleged misuse of Katsoris' and Loukoumi's intellectual property and ideas. Essentially, Katsoris and Loukoumi alleged that IMG took their intellectual property and ideas and used them to launch a television series with a third party. Their claims were meritless. Indeed, IMG ultimately prevailed in the arbitration, and Katsoris and Loukoumi recovered nothing.

19. On or about January 8, 2016, Katsoris and Loukoumi filed suit in the U.S. District Court for the Southern District of New York against IMG Productions, WME IMG and Viacom Inc. (the "*Katsoris* Lawsuit"). *See* Case No. 1:16-cv-00135-RA. The lengthy Complaint contains as its first paragraph, a statement as follows:

> This is an action for copyright and trademark infringement pursuant to the Copyright Act, 17 U.S.C. §101 *et seq.* and the Lanham Act, 15 U.S.C. § 1501 *et seq.*, together with a claim for a declaratory judgment concerning the character "Loukoumi the Lamb" and related intellectual property as well as New York State claims for trademark infringement, dilution, unfair competition, violations of Gen. Bus Law § 349, breach of fiduciary duty, and breach of contract, or, in the alternative, breach of implied contract. Additionally, Plaintiffs seek an injunction in aid of arbitration.

Complaint, ¶ 1. The Complaint further states: "[Loukoumi] intends to pursue its contract and other claims against IMG Productions through mediation and arbitration pursuant to the Work For Hire Services Agreement between the Foundation and IMG … ." Complaint, ¶ 150.

20. On or about April 1, 2016, Katsoris and Loukoumi filed a First Amended Verified and Supplemented Complaint, which included new causes of action by Katsoris against Viacom. On or about May 2, 2016, IMG moved to dismiss the First Amended Verified and Supplemented Complaint. On or about May 16, 2016, Katsoris and Loukoumi filed a combined letter opposition to IMG's motion to dismiss and cross-motion to compel arbitration between Loukoumi and IMG Productions.

21. On or about May 6, 2016, Loukoumi filed a one-page Demand for Arbitration with the AAA against IMG Productions and WME IMG, assigned Case No. 02-16-0000-6986 (the "*Loukoumi* Arbitration"). In the "Brief Description of the Dispute," Loukoumi asserted "Breach of Work for Hire Services Agreement dated May 28, 2014 and related claims."

22. On or about May 31, 2016, Katsoris and Loukoumi filed a Second Amended Verified and Supplemented Complaint, which included similar allegations plus a new cause of action by Katsoris against IMG for unjust enrichment/quantum merit, based on the allegation that IMG benefitted from Katsoris' work. Attached hereto as **Exhibit C** is a copy of the Second Amended Verified Complaint, without exhibits. On or about June 13, 2016, IMG moved to dismiss the Second Amended Verified Complaint. On or about June 27, 2016, Katsoris and Loukoumi filed their opposition to IMG's motion to dismiss the Second Amended Verified Complaint.

23. On or about June 27, 2016 (the same day that Katsoris and Loukoumi opposed IMG's motion to dismiss the Second Amended Verified Complaint), Katsoris and Loukoumi also moved to compel arbitration against all Defendants (including Viacom) and stay the Katsoris Lawsuit. On or about July 11, 2016, IMG filed its reply in further support of its motion to dismiss the Second Amended Verified Complaint. On or about July 18, 2016, IMG filed an opposition to Katsoris and Loukoumi's motion to compel arbitration.

24. On or about February 27, 2017, the Court in the *Katsoris* Lawsuit entered an Order granting Katsoris and Loukoumi's motion to compel arbitration as to IMG (but not Viacom) and staying the suit as against IMG and Viacom, reasoning in part that Loukoumi had not waived its right to arbitrate under the terms of the "Work for Hire" agreement with IMG Productions, and referring to the Arbitrator the issue of what claims were arbitrable.

25. On or about April 6, 2017, after the District Court entered the order compelling arbitration, Loukoumi filed a Statement of the Case in the *Loukoumi* Arbitration stating, among other things, that "the Second Amended Complaint in the *Katsoris* Lawsuit was adopted as its pleadings or description of the underlying dispute."

26. Like the *Katsoris* Lawsuit, the *Loukoumi* Arbitration was heavily contested. The parties engaged in months of discovery, including expert discovery and motions to compel, and filed dispositive motions.

27. On or about April 28, 2017, IMG filed its response to the Statement of the Case and also moved to deny arbitrability of the claims asserted in the Statement of the Case. On or about June 7, 2016, Loukoumi filed its opposition to IMG's motion and sought to add WME IMG and Katsoris as parties to the *Loukoumi* Arbitration. On or about June 19, 2017, IMG filed its reply. On or about June 27, 2017, the Arbitrator issued a decision denying Loukoumi's request to add Katsoris and WME IMG as parties, and directing Loukoumi to file an amended demand setting forth its causes of action and the relief it sought.

28. On or about July 17, 2017, Loukoumi filed a First Amended Arbitration Demand, adding factual allegations against WME IMG and claims that arguably belonged to Katsoris. On or about July 31, 2017, IMG Productions submitted its answer to the First Amended Arbitration Demand and simultaneously moved to deny arbitrability. On or about August 23, 2017, the Arbitrator denied IMG Productions' motion to deny arbitrability, but invited IMG Productions to renew its motion at the end of discovery.

29. On or about February 7, 2018, just weeks before the hearing was scheduled to start, Loukoumi filed a Second Amended Arbitration Demand, adding a claim for "breach of contract malfeasance, negligence and other tortious acts or omissions."

30.     Discovery in the *Loukoumi* Arbitration was extensive and contentious. The parties had a number of discovery disputes that had to be submitted to the Arbitrator including, but not limited to, the scope of the Protective Order, the number and identity of custodians whose documents would be searched, the search terms and date parameters of such document searches, and whether third-party subpoenas and pre-hearing depositions were appropriate. In addition, Loukoumi retained two expert witnesses, and IMG retained three expert witnesses.

31.     The Arbitrator held evidentiary hearings on March 5, 6, 8, 9 and April 25, 2018 during which nine witnesses testified. The parties also filed lengthy pre- and post-hearing briefs. Underwriters have copies of the relevant submissions in the *Loukoumi* Arbitration.

32.     On or about July 11, 2018, the Arbitrator issued an Award denying Loukoumi's claims in their entirety. Underwriters have a copy of the Award. After the *Loukoumi* Arbitration was concluded in IMG Productions' favor, the *Katsoris* Lawsuit was voluntarily dismissed.

33.     As noted above, under the terms of the E&O Policy, "multiple Claims arising from the same or a series of related or repeated acts, errors or omissions, or from any continuing acts, errors or omissions … shall be considered a single Claim." Underwriters have acknowledged in writing that the November 24, 2015 demand letter, the *Katsoris* Lawsuit and the *Loukoumi* Arbitration shall be considered a "Claim" under the E&O Policy. Thus, they are collectively referred to herein as the "*Katsoris* Claim."

### UNDERWRITERS' FAILURE TO REIMBURSE IMG'S DEFENSE FEES AND COSTS FOR THE *KATSORIS* CLAIM

34.     IMG provided timely notice of the *Katsoris* Claim to Underwriters by identifying it in a bordereaux report in or around March 2016 (within the Policy period of June 2015 through June 2016).

19320157V.9

35.     In or around July 2017, IMG and Underwriters exchanged correspondence regarding the *Katsoris* Claim in which, at IMG's request, Underwriters analyzed whether the $25,000 retention set forth in Endorsement 03 applicable to Insuring Agreement F applied to the Claim. On or about July 7, 2017, counsel for Underwriters sent a letter erroneously stating that Insuring Agreement F does not apply to the *Katsoris* Claim, because the claim relied on alleged acts taking place *after* IMG Productions' contractual engagement with Loukoumi had concluded.

36.     IMG contested this position in a letter sent on or about July 18, 2017, pointing out the flaws in Underwriters' conclusion. In response, on or about August 4, 2017, Underwriters reiterated its position but changed its reasoning, stating that because the alleged conduct by IMG was not performed "in the course of" IMG's performance of "Media Services" (which is not a term in the E&O Policy) – regardless of any temporal restriction – Insuring Agreement F does not apply.

37.     On or about February 26, 2018, prior to the evidentiary hearings in the *Loukoumi* Arbitration, Underwriters sent a letter in which it analyzed coverage for the *Katsoris* Claim in greater detail. In that letter, Underwriters recognized coverage solely under Insuring Agreement A, which has a $2 million retention. Underwriters continued to deny any application of Insuring Agreement F, despite the fact that the November 14, 2015 demand letter, the *Katsoris* Lawsuit and the *Loukoumi* Arbitration alleged acts or offenses specifically enumerated in Insuring Agreement F; and despite the fact that IMG's alleged conduct plainly occurred "in respect of" "production, broadcast, or distribution" of television programming, as set forth in Endorsement 03 (which applies the $25,000 retention).

38.     On or about July 26, 2018, after the *Loukoumi* Arbitration resolved in IMG's favor and the *Katsoris* Lawsuit was dismissed voluntarily, IMG wrote to again contest

Underwriters' coverage position, and again requested that Underwriters reconsider its position and reimburse IMG's defense fees and costs subject to the $25,000 retention applicable under Insuring Agreement F and Endorsement 03. In response, on or about August 31, 2018, Underwriters sent a letter again refusing coverage under Insuring Agreement F and Endorsement 03.

39. Notwithstanding Underwriters' unreasonable and erroneous position that only Insuring Agreement A applies to the *Katsoris* Claim, IMG provided all its defense invoices reflecting its legal costs and expenses (i.e., its "Claims Expenses" under the E&O Policy). These invoices reflect defense fees and costs of $2,266,730.27. Thus, even assuming Underwriters' unreasonable and erroneous application of a $2 million retention, IMG would still be entitled to reimbursement of a portion of its legal costs and expenses for the successful defense of the *Katsoris* Claim.

40. However, after receipt of the invoices, on or about September 21, 2018, Underwriters stated in writing that based on a preliminary review, it "estimates more than 38% of the billing falls into one or more non-allowable categories," and asked whether IMG sought a complete review of the invoices. IMG responded in the affirmative.

41. On or about June 15, 2019, Underwriters sent a letter describing its further review of the invoices, concluding this time that *only* $407,062.36 of the $2,266,730.27 (*less than 18%*) of IMG's defense fees and costs submitted for payment were "allowable amounts" under the E&O Policy; and thus, that Underwriters owed IMG no payment in connection with the *Katsoris* Claim. On or about May 20, 2020, counsel for IMG again contested in writing Underwriters' positions with respect to (a) Insuring Agreement F and Endorsement 03 and (b) Underwriters' invoice review.

42. On or about July 1, 2020, Underwriters sent a letter reiterating its coverage positions, and continued to deny any obligation to make any payment for IMG's defense fees and costs under the E&O Policy for the *Katsoris* Claim.

43. Since this letter, further attempts at resolving this dispute have failed.

## COUNT I
## Breach of Contract

44. IMG incorporates herein by reference paragraphs 1 through 43 as fully set forth herein.

45. Underwriters owed IMG a duty to defend the *Katsoris* Claim under Insuring Agreement F and Endorsement 03 of the E&O Policy, imposing on Underwriters a duty to pay IMG's defense fees and costs, subject to a $25,000 retention.

46. IMG complied with all terms and conditions in the E&O Policy, or such compliance has been excused, waived or relieved by estoppel. Additionally, none of the exclusions in the E&O Policy precludes coverage, or Underwriters' reliance on such exclusions has been waived or estopped.

47. Underwriters has breached its contractual obligations by refusing to pay IMG's defense fees and costs for the *Katsoris* Claim under the mutually bargained-for terms of the E&O Policy. In particular, Underwriters has adhered to the unreasonable and erroneous positions that its duty to defend IMG in the *Katsoris* Claim was triggered only by Insuring Agreement A of the E&O Policy, such that a $2 million retention must be satisfied; and that the vast majority of IMG's defense fees and costs for the *Katsoris* Claim are not "allowable amounts" to be credited against the retention or paid under the E&O Policy.

48. As a direct and proximate result of Underwriters' breach of contract, IMG has suffered damages, including without limitation, unreimbursed legal fees and expenses paid to defend the *Katsoris* Claim, plus interest thereon, in an amount to be proven at trial.

### COUNT II
### Breach of the Implied Covenant of Good Faith and Fair Dealing

49. IMG incorporates herein by reference paragraphs 1 through 43 as fully set forth herein.

50. There is an implied covenant of good faith and fair dealing that attaches to the E&O Policy at issue in this case.

51. Underwriters has breached the implied covenant of good faith and fair dealing in the E&O Policy. Even if Underwriters were correct that a $2 million retention applies to the *Katsoris* Claim (it does not), Underwriters was obligated to reimburse IMG for the defense fees and costs in excess of that retention. However, Underwriters took yet another unreasonable and erroneous (and bad faith) position: that only $407,062.36 of the $2,266,730.27 (*less than 18%*) of IMG's defense fees and costs were "allowable amounts" to be credited against the $2 million retention (which it claims applied). In other words, even if the higher retention applied (it does not), Underwriters found another way to ensure that it pay nothing for IMG's successful defense of the *Katsoris* Claim.

52. Underwriters took this unreasonable position vis-à-vis IMG's defense invoices after consenting to IMG's defense counsel and notwithstanding the fact that IMG obtained a complete defense verdict in the lengthy, factually-complex *Katsoris* Claim, which required, among other things, extensive motion practice before the United States District Court for the Southern District of New York and the AAA, discovery, expert discovery, and a 5-day arbitration hearing. Further evidencing bad faith, Underwriters' conclusion that the vast majority

of the invoice entries were not an "allowable amounts" was made without reference to a discernable standard or provision in the E&O Policy.

53. Underwriters also breached the implied covenant of good faith and fair dealing by, among other things:

(a) Misrepresenting the terms and conditions of the E&O Policy and their intended purpose, including without limitation, ascribing an unreasonable and unduly narrow scope to Insuring Agreement F and the specifically bargained-for Endorsement 03 to the E&O Policy, while later adopting and adhering to an unreasonable position that only Insuring Agreement A could apply to Underwriters' duty to defend the *Katsoris* Claim;

(b) Failing to honor its coverage obligations under the E&O Policy, including its duty to defend IMG in the *Katsoris* Claim under Insuring Agreement F and Endorsement 03, which were plainly triggered by the allegations in the *Katsoris* Claim, thus requiring payment of IMG's defense fees and costs in excess of a $25,000 deductible;

(c) Taking positions regarding the E&O Policy and the *Katsoris* Claim that are inconsistent with and contrary to its own, previous positions, in order to avoid acknowledging that Insuring Agreement F and Endorsement 03 triggered Underwriters' duty to defend;

(d) Elevating its own interests over that of its insured by, among other things, repeatedly adhering to the unreasonable position that only Insuring Agreement A (with a $2,000,000 retention) triggered Underwriters' duty to defend, as opposed to Insuring Agreement F and Endorsement 03 (with a $25,000 retention); and, as described above, by adjusting IMG's defense invoices in a way that results in no payment by Underwriters under the E&O Policy even if, under Underwriters' own theory, the $2,000,000 retention applied;

(e)     Forcing IMG to litigate this coverage action in order to gain the benefits of the E&O Policy.

54.     IMG is entitled to damages for Underwriters' breach of the implied covenant of good faith and fair dealing, including without limitation, the attorneys' fees and costs IMG has expended and will expend to address Underwriters' breach and obtain the insurance coverage to which it is entitled for the *Katsoris* Claim, plus pre-judgment interest thereon, punitive damages, and such other relief as the Court deems appropriate.

## COUNT III
### Declaratory Judgment

55.     IMG incorporates herein by reference paragraphs 1 through 43 as fully set forth herein.

56.     IMG has complied with all terms and conditions in the E&O Policy, or such compliance has been excused, waived or relieved by estoppel.  Additionally, none of the exclusions in the E&O Policy preclude coverage, or Underwriters' reliance on such exclusions has been waived or estopped.

57.     There is no dispute that the *Katsoris* Claim triggered Underwriters' duty to defend IMG under the E&O Policy.  IMG contends that Insuring Agreement F triggered Underwriters' duty to defend IMG for the *Katsoris* Claim, and that the $25,000 retention set forth in Endorsement 03 applies to re-payment of IMG's defense fees and costs.  On the other hand, Underwriters has adhered to the unreasonable and erroneous position that only Insuring Agreement A of the E&O Policy triggered its duty to defend IMG in the *Katsoris* Claim, such that a $2 million retention applies.  Underwriters further took the unreasonable and erroneous position that only $407,062.36 of the $2,266,730.27 (*less than 18%*) of IMG's defense fees and costs were "allowable amounts" to be credited against the $2 million retention (which it claims

applied) or paid under the E&O Policy. As a result, Underwriters contends that it owes nothing to IMG for the defense of the *Katsoris* Claim.

58. In light of the above, there exists a "case of actual controversy" between IMG and Underwriters under 28. U.S.C. § 2201, related to Underwriters' duty to reimburse IMG for its defense fees and costs in the *Katsoris* Claim.

59. A declaration of rights pursuant to 28 U.S.C. §§ 2201 and 2202 would resolve the uncertainty with respect to the obligations of Underwriters under the E&O Policy.

60. Among other things, IMG is entitled to a declaration that Underwriters owed IMG a duty to defend the *Katsoris* Claim under Insuring Agreement F and Endorsement 03 of the E&O Policy, such that Underwriters must repay IMG for its defense fees and costs, subject to a $25,000 retention.

\* \* \*

WHEREFORE, IMG respectfully seeks the following:

(1) That the Court enter judgment in favor of IMG on all causes of action;

(2) On Count One, damages for Underwriters' breach of contract, in an amount sufficient to compensate IMG for Underwriters' breach;

(3) On Count Two, damages for Underwriters' breach of the implied covenant of good faith and fair dealing, in an amount sufficient to compensate IMG for Underwriters' bad faith, including IMG's attorneys' fees and costs, plus pre-judgment interest thereon, and punitive damages;

(4) On Count Three, judgment on IMG's behalf declaring that Underwriters has a duty to repay IMG for the full amount of the defense fees and costs it incurred defending the *Katsoris* Claim, subject to the $25,000 retention described in Endorsement 03 to the E&O Policy, and that the positions identified in Count Two shall be resolved in favor of IMG;

(5) IMG's attorneys' fees, pre-judgment and post-judgment interests, costs and expenses of this action;

(6) This case be tried by a jury; and

(7) Any other, further relief as the Court deems equitable and just.

## JURY TRIAL DEMAND

IMG hereby demands a trial by jury of all issues so triable.

Dated:  December 14, 2021

Respectfully submitted,

/s/ Bryan Wolin
Bryan Wolin (BW8339)
bwolin@kilpatricktownsend.com
**KILPATRICK TOWNSEND & STOCKTON LLP**
The Grace Building
1114 Avenue of the Americas, 21st Floor
New York, NY USA 10036
Tel. (212) 775-8700
Fax (212) 775-8800

Brent W. Brougher
bbrougher@kilpatricktownsend.com
(*Pro hac vice* application forthcoming)
**KILPATRICK TOWNSEND &STOCKTON LLP**
1100 Peachtree Street, Suite 2800
Atlanta, GA  30309
Tel. (404) 815-6500
Fax (404) 815-6555

*Attorneys for Plaintiffs*